James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, NJ  07068-1739
(973) 994-1700

Jonathan Stein
Adam Warden
SAXENA WHITE P.A.
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
(561) 206-6714

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF BIRMINGHAM FIREMEN'S AND POLICEMEN'S SUPPLEMENTAL PENSION SYSTEM on Behalf of Itself and all Other Similarly Situated Shareholders of Chiquita Brands International, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> CHIQUITA BRANDS INTERNATIONAL, INC.; KERRII B. ANDERSON; HOWARD W. BARKER, JR.; EDWARD F. LONERGAN; CLARE M. HASLER-LEWIS; CRAIG E. HUSS; JEFFREY N. SIMMONS; STEVEN P. STANBROOK; and RONALD V. WATERS, III, <br><br> Defendants. | Civil Action No.: <br><br><br><br> **COMPLAINT AND** <br> **DEMAND FOR JURY TRIAL** |

Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System

on behalf of itself and all other similarly situated public shareholders (the "Class") of Chiquita

Brands International, Inc. (hereafter, "Chiquita" or the "Company"), a New Jersey corporation,

make the following allegations, by their undersigned attorneys, against members of Chiquita's Board of Directors (the "Chiquita Board" or "Board") to remedy the Chiquita Board's breaches of fiduciary duties, and against Chiquita for injunctive relief.  The allegations of the Complaint are based on the personal knowledge of Plaintiff, as to itself, and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters stated herein.

## SUMMARY OF THE ACTION

1.      This is a class action for breaches of fiduciary duties and for an injunction against the Chiquita Board and Chiquita on account of their conduct associated with a proposed merger transaction with Fyffes PLC, an Irish domiciled corporation (hereafter, the "Proposed Transaction), described further below.

2.      The Chiquita Board breached its fiduciary duties by failing to maximize shareholder value, and agreeing to a deal involving an unfair price when a higher, competing bid was on the table and clearly in shareholders' best interest.  Instead of entertaining the higher, competing bid, the Chiquita Board instead set up diminished and rushed negotiations and erected defensive measures designed to thwart any higher offer.  It did this because Chiquita executives and members of the Board were assured continued employment and a future role in the newly merged entity ("ChiquitaFyffes") that was not assured with the higher, competing offer.  Thus, in breach of their fiduciary duties to Chiquita shareholders, members of the Chiquita Board preferred their own interests over the interests of Chiquita shareholders.

3.      On March 10, 2014, Fyffes and Chiquita announced that they had reached an agreement to merge and form a new entity, ChiquitaFyffes plc ("ChiquitaFyffes").  Pursuant to the original terms of the merger, Chiquita stockholders would own 50.7% of ChiquitaFyffes and

Fyffes stockholders would own 49.3% of ChiquitaFyffes.  In addition, the Board of Directors of ChiquitaFyffes would be comprised of an equal number of directors from each company, as well as one, mutually agreed-upon, independent director.  Finally, David McMann, the head of Fyffes, would serve as CEO of ChiquitaFyffes, while Edward Lonergan, the CEO of Chiquita, would be the Chairman of the ChiquitaFyffes board of directors.  Additional members of senior management would hail from both companies, and its executive offices would be divided in both Charlotte, North Carolina (where Chiquita is headquartered) and Dublin, Ireland (where Fyffes is located).

4.      Pursuant to an Expenses Reimbursement Agreement, negotiated in connection with the original Transaction Agreement, either party is required to pay a fee of 1% of the party's equity value to the counterparty if the Transaction Agreement is terminated for various reasons, including whether an alternative proposal were entertained or whether a superior proposal were accepted ("Termination Fee").

5.      On August 27, 2014, two Brazilian entities, Cutrale Group and Safra Group (together, "Cutrale-Safra") announced that they had made an all cash offer to acquire all outstanding shares of Chiquita common stock for $13 per share ("Cutrale-Safra Proposal"). Cutrale-Safra stated that the implied value that Chiquita shareholders were to receive pursuant to the original Fyffes transaction was only approximately $10 per share.  The Cutrale-Safra Proposal was not contingent on Cutrale-Safra's ability to obtain financing; rather the two entities were prepared, ready and able to finance the deal themselves.  The Cutrale-Safra Proposal was clearly a superior offer to the Proposed Transaction, offering Chiquita shareholders approximately 30% more per share, and eliminating many of the risks they would have to undertake in any new combined enterprise, as described below.

6.      Although the original Fyffes transaction permitted the Chiquita Board to negotiate with third parties and provide them with confidential information if a superior offer was made, the Chiquita Board initially declined to negotiate with Cutrale-Safra.  Eventually, however, amidst pressure, Chiquita finally announced that it had made certain confidential information available to Cutrale-Safra.

7.      Just days after allowing the Cutrale-Safra parties access to due diligence materials, the Chiquita Board announced that it had agreed to new terms with Fyffe.  On September 26, 2014, the Chiquita Board announced that the terms of the Proposed Transaction had been amended so that Chiquita shareholders would now own 59.6% of ChiquitaFyffes, and the Fyffes shareholders would own 40.4% of the combined entity.  Still, according to Cutrale-Safra, this revised transaction would only value the Chiquita shares at $11.89 per share, approximately 10% less than the amount offered by Cutrale-Safra.

8.      While this Board action somewhat enhanced the consideration that shareholders would receive in a ChiquitaFyffes merger, the Board also saw fit to materially increase the Termination Fee that Chiquita would have to pay Fyffes if the Chiquita Board chose to accept and pursue the superior offer from Cutrale-Safra.  Under the new terms, the Termination Fee increased from 1.0% of its equity value *to 3.5% of its equity value*, should Chiquita accept a "Superior Proposal," or negotiate with an unsolicited "Alternative Proposal."  This onerous Termination Fee is a deal protection device that substantially reduces the possibility that Chiquita would be sold to Cutrale-Safra, or any other third-party bidder, as any competing bidder would essentially be required to pay a naked premium for the right to provide Chiquita's stockholders with a superior offer.

9.     The Proposed Transaction is unfair to Chiquita shareholders for several reasons. First, the Fyffes shareholders are heavily favored compared to the Chiquita shareholders.  For example, pursuant to the original terms of the proposed merger, although the Chiquita shareholders were receiving a premium to their shares of common stock of just 4.2% to 12.3%, as estimated by Chiquita's financial advisors, the Company announced that Fyffes shareholders would receive a premium of approximately 36-38% to the trading price of Fyffes common stock. While the Company has not disclosed the relative premiums pursuant to the revised terms of the Proposed Transaction, Fyffes stockholders stand to benefit more.  Indeed, the market recognizes that Fyffes got the better end of the bargain, because from the period of March 10, 2014 until August 27, 2014 (prior to the announcement of the Cutrale-Safra Proposal), Fyffes shares increased by 21%.  The price of Chiquita's shares, in contrast declined by 21% during the same period, even though a comparable company's stock, Fresh Del Monte, increased by 7.2%.

10.     In addition, even though some financial analysts estimated that Chiquita accounted for over 55% of the combined entity, as measured by revenues, EBITDA and outstanding equity, initially the Chiquita shareholders were only receiving a 50.7% stake in the combined entity.  Although this was later increased to a 59.6%, amidst pressure, the fact that the Chiquita Board recommended a transaction with terms that heavily favored the Fyffes shareholders demonstrates their willingness to breach their fiduciary duties.

11.     Furthermore, the Proposed Transaction creates significant risks that the shareholders in the new enterprise would be forced to assume and fundamentally changes the nature of their investment.  For example, there is a risk that the combined entity will not realize the $60 million in synergies that Chiquita management has touted.  (European antitrust regulators have already placed shipping exclusivity restrictions on any combined company).  There is also a

risk that the tax advantages Chiquita seeks to enjoy by becoming an Irish company will be diminished or eliminated on account of pending, proposed or future U.S. legislation (which has made recent headlines).  There is also a risk that the combined entity will experience significant integration costs.  The cash-out Cutrale-Safra Proposal would eliminate all risks associated with a merger, and particularly a merger with a foreign entity.

12.    Even pursuant to the revised terms of the Proposed Transaction, Chiquita shareholders stand to receive just $11.82 per share in value.  This amount is unfairly low and a breach of the Chiquita Board's fiduciary duties.   In addition, the failure to negotiate with Cutrale-Safra despite that the Cutrale-Safra Proposal is undeniably a superior offer to the Proposed Transaction constitutes a breach of the Chiquita Board's fiduciary duties.

13.    The Proposed Transaction also cedes significant control of the Company to Fyffes executives, and forces Chiquita shareholders to relinquish important rights they currently enjoy as shareholders of a New Jersey corporation.

14.    Finally, by agreeing to raise the Termination Fee from 1% to 3.5% of Chiquita's equity value, the Chiquita Board made it highly unlikely that the Cutrale-Safra Proposal – or any other proposal – would be consummated.  Thus, the Chiquita Board of Directors has deprived the Chiquita shareholders from realizing the maximum value for their shares as could be determined only through a fair, unencumbered bidding process.

## JURISDICTION AND VENUE

15.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because Plaintiff is a citizen of the State of Alabama and Defendants are citizens of states other than Alabama, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that this is the judicial district in which Chiquita is incorporated and thus can be deemed to reside.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

17.     Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System ("FP Pension System") is a retirement fund for Firemen and Policemen of the City of Birmingham, with its principal place of business /o James Love, City of Birmingham Department of Law, 710 North 20th Street, Room 600 City Hall, Birmingham, AL 35203.  FP Pension System is a stockholder of Chiquita, has been a stockholder of Chiquita at all material times alleged in this Complaint, and will continue to be a stockholder throughout its pendency.

18.     Defendant Kerrii B. Anderson ("Anderson") is a citizen of the State of Ohio, residing in Columbus, Ohio and  is Chairwoman of Chiquita's Board, Chair of the Nominating and Governance Committee, and a member of the Audit Committee.  Anderson was elected to the Board in April 2009 and assumed the role of Chairwoman on October 8, 2012.  Anderson owns 64,833 shares of Chiquita stock and received $240,829 in compensation as a director for Chiquita in 2013.

19.     Defendant Edward F. Lonergan ("Lonergan") a citizen of the State of Florida, residing in Miami Florida and  is President and Chief Executive Officer for Chiquita, as well as a member of the Board.  Lonergan was appointed as President and CEO and named to the Board on October 8, 2012.  Lonergan receives an annual salary of $900,000.  Upon his appointment, Lonergan received a restricted stock grant of 231,065 shares, with options to purchase 1,440,062 shares.

20.     Defendant Howard W. Barker, Jr. ("Barker") is a citizen of the State of Florida, residing in Coral Gables, Florida and is a member of the Board and Chair of the Audit Committee.  Barker was elected to the Board on September 24, 2007.  Barker owns 80,863 shares of Chiquita stock and received $212,500 in compensation as a director for Chiquita in 2013.

21.     Defendant Clare M. Hasler-Lewis ("Hasler-Lewis") is a citizen of the State of California, residing in Woodland, California is a member of the Board and chair of the Food Safety, Technology and Sustainability Committee.  Hasler-Lewis was elected to the Board in October 2005.  Hasler-Lewis received $195,500 in compensation as a director for Chiquita in 2013.

22.     Defendant Craig E. Huss ("Huss") is a citizen of the State of Illinois, residing in Decatur, Illinois is a member of the Board.  Huss was elected to the Board on July 18, 2013. Huss received $87,219 in compensation as a director for Chiquita in 2013.

23.     Defendant Jeffrey N. Simmons ("Simmons") is a citizen of the State of Indiana, residing in Carmel, Indiana is a member of the Board and Chair of the Compensation & Organization Development Committee.  Simmons was elected to the Board on May 27, 2011. Simmons received $204,643 in compensation as a director for Chiquita in 2013.

24.     Defendant Steven P. Stanbrook ("Stanbrook") is a citizen of the State of Wisconsin, residing in Racine, Wisconsin is a member of the Board.  Stanbrook was elected to the Board on December 20, 2002.  Stanbrook received $188,000 in compensation as a director for Chiquita in 2013.

25.     Defendant Ronald V. Waters III ("Waters") is a citizen of the State of South Carolina, residing in Bluffington, South Carolina and is a member of the Board and a member of

the Audit Committee.  Waters was elected to the Board on October 29, 2012.  Waters received $192,500 in compensation as a director for Chiquita in 2013.

26.     Defendants Anderson, Lonergan, Barker, Hasler-Lewis, Huss, Simmons, Stanbrook, and Waters collectively constitute the entirety of the Company's Board.  These individuals are hereinafter referred to as the "Individual Defendants" or the "Chiquita Directors."

27.     Defendant Chiquita is a New Jersey corporation with its principal place of business in Charlotte, North Carolina.  Chiquita is one of the leading marketers and distributors of bananas, salads, and other fruits and vegetables.  Chiquita's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CQB."

## RELEVANT THIRD PARTIES

28.     Fyffes PLC ("Fyffes"), an Irish corporation headquartered in Dublin, Ireland, is a leading international importer and distributor of bananas, pineapples and melons.  Fyffes PLC is listed on the Enterprise Securities Market in Dublin, Ireland and the Alternative Investment Market in London, England.

29.     ChiquitaFyffes plc ("ChiquitaFyffes") is a private limited company incorporated in Ireland under the name Twombly One Limited that was formed solely for the purpose of implementing the transaction.   If the Proposed Transaction were to be consummated, ChiquitaFyffes will trade on the NYSE.

30.     CBII Holding Corporation ("Delaware Sub") is a company incorporated in Delaware and is a direct wholly owned subsidiary of ChiquitaFyffes, formed on March 4, 2014. After completion of the combination, Delaware Sub would serve as the parent of Chiquita.

31.     Chicago Merger Sub, Inc. ("Merger Sub") is a company incorporated in New Jersey and a direct wholly owned subsidiary of Delaware Sub, formed on March 4, 2014.

## FACTUAL ALLEGATIONS

### A.    Initial Terms of the Proposed Transaction

32.    On March 10, 2014, Chiquita and Fyffes announced that the Boards of Directors of both companies approved an agreement whereby Chiquita would combine with Fyffes to create a new entity called ChiquitaFyffes, in a stock-for-stock transaction.  Pursuant to the original transaction terms, Chiquita stockholders would own 50.7% of ChiquitaFyffes, and Fyffes stockholders would own 49.3% of the new entity, which would become a public limited company organized under and subject to the laws of Ireland.

33.    Under the terms of the original transaction, each Fyffes shareholder would receive 0.1567 ChiquitaFyffes shares for each Fyffes share they owned, and each Chiquita shareholder would receive one ChiquitaFyffes share for each Chiquita share owned.  The transaction placed a 38% premium on the value of Fyffes closing share price as of March 7, 2014, and represented a combined equity value of ChiqutaFyffes of $1.07 billion.  The premium placed on the value of Chiquita common stock, if any, was not initially disclosed.  The fact that the Fyffes shareholders are receiving a substantial premium on the value of their shares, whereas the Chiquita shareholders apparently are not, is unfair to Chiquita shareholders.

34.    Pursuant to the terms of the original transaction, the senior leadership from both Chiquita and Fyffes were set to retain their roles in the new entity, ChiquitaFyffes.  Lonergan was poised to become the Chairman of the Board, and David McCann, the Executive Chairman of Fyffes, would become the Chief Executive Officer of ChiquitaFyffes if the transaction was consummated.  In addition, the chief financial officer and the chief operating officer of fresh fruits would come from Fyffes.  The combined Board of Directors would include an equal number of directors from both companies and one mutually agreed upon outside director.   By relinquishing key management roles to Fyffes, and securing themselves positions with the

combined ChiquitaFyffes company, the Chiquita Board negotiated an unfair deal for the Chiquita shareholders.

35.     The original transaction approved by the Chiquita Board also included a termination fee pursuant to an "Expenses Reimbursement Agreement," equal to 1% of the total value attributable to the entire issued share capital of either party.  Pursuant to Section 4 of the Expenses Reimbursement Agreement, Chiquita would have been required to pay Fyffes 1% (approximately $6.6 million) of the total value attributable to the issued share capital of Chiquita that is subject to the merger upon certain circumstances, including if the Board changed its recommendation regarding the merger, if the Board negotiated with a third party bidder in a "Chiquita Alternative Proposal," or if the Board entered into an agreement that constituted a "Chiquita Superior Proposal."  Under the Supplemental Expenses Reimbursement Agreement, executed on September 25, 2014, this amount was increased to 3.5% (approximately $6.6 million) of the total value attributable to Chiquita's issued share capital.  However, the Termination Fee that Fyffes would have to pay did not increase under the Supplemental Expenses Reimbursement Agreement, per Irish law, which prohibits Chiquita from recovering expenses from Fyffes in an amount exceeding 1% of the equity value of Fyffes if the transaction agreement is terminated under the circumstances specified.

36.     A Chiquita Alternative Proposal, as defined in the original Transaction Agreement, means any *bona fide* proposal or *bona fide* offer made by any person for (i) the acquisition of Chiquita by takeover offer or business combination transaction; (ii) the acquisition by any person of 25% or more of the assets of Chiquita; (iii) the acquisition by any person of 25% or more of the outstanding shares of Chiquita or (iv) any merger, business combination, consolidation, share exchange, recapitalization or similar transaction involving Chiquita as a

result of which the holders of Chiquita shares immediately prior to the transaction own less than 75% of the outstanding voting power of the surviving entity.

37.     A Chiquita Superior Proposal, as defined in the Transaction Agreement, is an unsolicited written *bona fide* Chiquita Alternative Proposal made by any person that the Chiquita Board determines in good faith (after consultation with Chiquita's financial advisers and outside legal counsel) is more favorable to the Chiquita shareholders than the Proposed Transaction, taking into account such financial, regulatory, legal and other aspects of such proposal the Chiquita Board considers appropriate.

38.     On August 6, 2014, Chiquita filed its definitive proxy statement ("Proxy Statement"), setting a vote on the Proposed Transaction for September 17, 2014.[1] Consummation of the merger, as originally conceived, and agreed to (and as it stands today revised) is dependent on a vote of the majority of Chiquita outstanding shares.

39.     The Proxy Statement explained the mechanism of the Proposed Transaction. ChiquitaFyffes was to acquire Fyffes by means of a "scheme of arrangement" (the "Scheme") which is an Irish statutory procedure pursuant to the Companies Act of 1963, under which the Irish High Court could bind a company and its shareholders to an arrangement.  Here, the Scheme involves cancelling all shares of Fyffes and issuing new ChiquitaFyffes ordinary shares to the applicable shareholders.  At the completion, the holder of each Fyffes ordinary share would be entitled to receive 0.1567 of ChiquitaFyffes ordinary shares.  Fyffes shareholders were expected to hold approximately 49.3% of ChiquitaFyffes.

---

[1] On September 7, 2014, Chiquita notified Fyffes that it intended to postpone the special meeting of Chiquita shareholders to vote on the Proposed Transaction to October 3, 2014 in conjunction with Chiquita furnishing nonpublic information to and engaging in discussions with Cutrale-Safra.  Subsequently, that date was again adjourned to October 24, 2014.

40.     Following the implementation of the Scheme, Merger Sub would be merged with and into Chiquita, with Chiquita surviving as an indirect wholly owned subsidiary of ChiquitaFyffes.  Each Chiquita common share of stock would be cancelled, and converted into the right to receive one common share of ChiquitaFyffes.  Chiquita shareholders were expected to hold approximately 50.7% of ChiquitaFyffes following the transaction.

**B.     History of the Negotiations and Fairness Opinions**

41.     The Proxy Statement provided some details about the history of the negotiations between Chiquita and Fyffes, as well as some financial information concerning the purported fairness of the Chiquita Fyffes merger.

42.     According to the Proxy Statement, in December 2010, Chiquita had established a Strategic Transaction Committee ("STC") to explore potential strategic alternatives.

43.     Between the months of May 2012 and November 2012, Chiquita had been engaged in discussions and negotiations with a company, identified as Company A, for a potential business combination, but these discussions were ultimately abandoned because of failure to reach agreement.

44.     At the end of 2011, Fernando Aguirre, then Chairman of the Board and CEO of Chiquita, approached David McMann, the Executive Chairman of Fyffes, to determine if Fyffes was interested in exploring a transaction.  On December 21, 2011, Chiquita and Fyffes executed a reciprocal confidentiality agreement and hired regulatory and Irish counsel.

45.     Chiquita then hired Goldman, Sachs & Co. ("Goldman Sachs") as its financial advisor.  In March 2012, Goldman Sachs engaged in conversations with Fyffe's financial advisor, Lazard Freres ("Lazard").  In April 2012, Mr. Aguirre and Mr. McCann also engaged in discussions.  During those meetings, Fyffes stated it was not for sale, but would be interested in

an all-stock transaction, so long as Fyffes received a premium to its current valuation. Ultimately Fyffes communicated a proposal contemplating that the parties would negotiate an exchange ratio giving Chiquita shareholders between 51% and 55% of the combined entity. However, as of the end of summer of 2012, no agreement was reached between Fyffes and Chiquita.

46.     On October 20, 2013, Mr. Lonergan, who had taken over from Mr. Aguirre as the CEO of Chiquita, and Mr. McCann, the executive director of Fyffes, saw each other at a trade show.  Mr. Lonergan asked whether Fyffes would be interested in reopening discussions of a business combination between their two companies.  Mr. McCann indicated he would be interested but only if Fyffes and Chiquita each owned approximately 50% of the combined entity, and if the name and governing structure of the combined entity reflected that it was a combination of Fyffes and Chiquita.

47.     On November 5, 2013, the STC determined that it was beneficial to further explore a combination between Fyffes and Chiquita.

48.     On November 25, 2013, Mr. Lonergan sent to Mr. McCann a term sheet which proposed equity splits between Chiquita and Fyffes at ranges from 52.4%/47.6% to 50.3%/49.7%.   On December 2, 2013, representatives from Goldman Sachs and Lazard discussed broad terms of a potential transaction.  Goldman Sachs noted that any potential transaction would involve Chiquita shareholders owning more than 50% of the combined company.  On that same day, Mr. Lonergan and Mr. McCann came to agreement that the exchange ratio would provide Chiquita's shareholders with 50.7% of the combined entity, and Fyffe's shareholders with 49.3% of the combined entity.

49.     On December 4, 2013, Mr. Lonergan and Mr. McCann established the following terms as a potential framework for further discussions: (1) a 50.7%/49.3% equity split; (2) the board of directors would be comprised of an equal number of directors from each company, with an additional independent director to be mutually agreed upon; (3) Mr. McCann would be the CEO, and Chiquita would nominate the chairman of the board; (4) executive management would include members of both companies' existing management; (5) shares of the new entity would be listed on the NYSE; (6) senior executives would be based in Dublin, Ireland and Charlotte, North Carolina; and (7) the name of the combined company would be a combination of Chiquita and Fyffes.

50.     On March 9, 2014, Goldman Sachs, financial advisor to Chiquita, delivered an opinion to the Chiquita Board that it believed the merger transaction was fair from a financial point of view to the Chiquita shareholders.  Goldman Sachs performed several calculations according to different valuation methods to erroneously conclude the merger transaction was fair.

51.     First, Goldman Sachs calculated the enterprise value of Chiquita at $1.143 billion, and calculated the enterprise value of Fyffes at $372 million.  Based on this alone, the ratio of ownership in the combined ChiquitaFyffes of approximately 50/50 appears to be manifestly unfair to Chiquita shareholders.

52.     Second, Goldman Sachs performed an illustrative analysis of the implied present value of the future share price of Chiquita, and determined that, as a standalone company, the range of implied present values per Chiquita share was $6.89 to $10.51.

53.     Third, Goldman Sachs performed an illustrative discounted cash flow analysis of implied present values of the synergies per Chiquita common share, assuming estimated annual

synergies of $40 million per year after 2016, per management's guidance.  Goldman Sachs accepted the $40 million in synergies from management and expressed no view as to whether that number was correct.  Goldman Sachs determined that the value per share of the synergies to Chiquita stock was $2.30 to $2.63 per share.  Goldman Sachs also performed an illustrative discounted cash flow analysis for Chiquita as a standalone company, using management-supplied forecasts, and determined that as a standalone company, Chiquita's common stock valuation ranged from ***$10.04 to $13.35 per share***.  Goldman Sachs compared these values to the illustrative per-share values of ChiquitaFyffes, which ranged from $11.27 to $13.92, and determined that the premium to Chiquita's common stock as a standalone company that was being offered pursuant to the merger transaction was just 4.2% to 12.3%.

54.    Fourth, Goldman Sachs performed a selected company analysis, comparing Chiquita to Fyffes, Fresh Del Monte Produce Inc., and Dole Food Company, Inc.  Goldman Sachs calculated various enterprise values of these companies as a multiple of various EBITDA estimates.  Goldman Sachs determined that Chiquita had an EBITDA multiple ranging from 6.3x to 7.7x, that Fyffes had an EBITDA multiple ranging from 5.6x to 7.0x, that Fresh Del Monte had an EBITDA multiple ranging from 7.1x to 8.8x, and that Dole had an EBITDA multiple ranging from 5.6x to 7.7x.

55.    Fifth, Goldman Sachs conducted an analysis it titled "Implied Ownership of ChiquitaFyffes Based on Historical Stock Price Performance Analysis."  Here, Goldman Sachs looked at closing prices and volume-weighted average trading prices of Chiquita and Fyffes common stock.  Goldman Sachs concluded that Chiquita's "implied ownership" in ChiquitaFyffes was between 58.6% and 59.4%, far below the 50.7% that Defendants negotiated.

56.     Sixth, Goldman Sachs conducted a "Contribution Analysis," in which it looked at illustrative pro forma relative contributions of Chiquita and Fyffes to ChiquitaFyffes with respect to revenue and EBITDA.   Based on revenues and EBITDA, Goldman Sachs concluded that Chiquita's contribution to ChiquitaFyffes was between 67.7% and 73.7%.   Goldman Sachs then factored in relative implied contributions from equity, and in five out of six scenarios, concluded that Chiquita ownership in the new entity was above 53.5%, again higher than the 50.7% that was negotiated.

57.     Pursuant to its engagement letter with Chiquita, Goldman Sachs will receive $4 million from Chiquita, "the principal portion of which is contingent upon consummation" of the transaction.   Goldman Sachs, therefore, had a financial incentive to conclude that the transaction was fair to Chiquita's shareholders from a financial point of view.

58.     Wells Fargo Securities ("Wells Fargo"), advisor to the Chiquita Board, also rendered a fairness opinion which was presented to the Chiquita Board on March 9, 2014.  Wells Fargo also conducted a number of analyses designed to demonstrate that the Fyffes merger transaction was fair.

59.     First, Wells Fargo conducted a "selected companies analysis," which compared the enterprise value as a multiple of EBITDA of Chiquita to Fresh Del Monte, Total Produce plc and Fyffes.  Wells Fargo determined that Chiquita's enterprise value in 2013 and 2014 of 9.3x and 6.4x, respectively, were comparable to the three selected companies, which ranged from 7.1x to 10.2x.  Based on this, Wells Fargo selected multiple ranges of 7.5x to 9.0x for 2013 and 6.5x and 8.0x for 2014, and determined that Chiquita's implied per share value was between $6.37 and $9.96 based on 2013 EBITDA multiples and between $7.40 and $11.75 based on 2014 EBITDA multiples.

60.     Second, Wells Fargo conducted a "selected transactions analysis," looking at 14 acquisitions that occurred between April 2004 and December 2013.  Wells Fargo determined that the enterprise value/LTM EBITDA ratios for those transactions ranged from 6.0x to 10.4x. Using this, Wells Fargo applied ranges of 8.5x to 10.0x LTM EBITDA to 2013 for Chiquita and determined that the implied per share value for Chiquita was between $8.77 and $12.33.

61.     Third, Wells Fargo conducted a discounted cash flow analysis.  This analysis determined that the implied per share value range for Chiquita was approximately ***$13.25 to $18.12 on a standalone basis***.  Applying this, Wells Fargo calculated an implied exchange ratio of 0.0740x to 0.1290x for Fyffes shareholders, excluding synergies.  The 0.1567x ratio negotiated falls outside this range to the benefit of Fyffes shareholders, over Chiquita's shareholders.

62.     Fourth, Wells Fargo conducted a "contribution analysis," and determined that Chiquita's contribution for the metrics selected to the combined equity value of the pro forma ChiquitaFyffes ranged from 23.2% to 58.7%.

63.     Wells Fargo was paid $750,000 for rendering its fairness opinion.  Wells Fargo and its affiliates received a total of $2.2 million from Chiquita during 2013 for investment banking and other financial services.

64.     Fyffes retained Lazard as its financial advisor.  One analysis that Lazard performed was to look at analyst price targets.  Lazard noted that Chiquita's price per share targets as determined by analysts that follow the Company ranged from $13.00 to $15.00.  Based on this, the implied exchange ratio for Fyffes should range from 0.090 to 0.104, which is significantly lower than the 0.1567 initially negotiated by the Chiquita Board for Fyffes shareholders.

65.     On March 29, 2014, the Chiquita board of directors voted unanimously to approve the transaction agreement and determined that the terms of the transaction were fair to and in the best interests of Chiquita and its shareholders.

### C.  The Cutrale-Safra Proposal and the Renegotiation of the Proposed Transaction

66.     On August 11, 2014, Brazilian orange juice conglomerate Cutrale Group and a Brazilian investment company Safra Group (together, "Cutrale-Safra") publicly announced their offer to acquire all the outstanding shares of Chiquita stock for $13 per share, payable in cash ("Cutrale-Safra Proposal").  The deal was valued at $1.25 billion, and represented a 29% premium to the $10.06 closing sales price per Chiquita Share on August 8, 2014, the last trading day before the Cutrale-Safra Proposal was announced.

67.     According to Cutrale-Safra, the value to Chiquita shareholders of the Proposed Transaction is $11.82 per share of Chiquita common stock.  Thus, the Cutrale-Safra Proposal of $13 in cash per share offers Chiquita shareholders an additional 10% in value, payable in cash.

68.     According to Cutrale-Safra, the proposed cash offer represents an 11.8x multiple of Chiquita's reported adjusted EBITDA for the last 12 months ended June 30, 2014, which, according to Cutrale-Safra is a record high transaction multiple as compared to acquisitions of this scale in the fresh produce sector.

69.     On August 11, 2014, Chiquita issued a press release in response to the Cutrale-Safra Proposal, stating that the Board was reviewing the proposal and reaffirming that it "strongly believe[s] in the strategic merits and value provided by the proposed transaction with Fyffes plc."

70.     On August 11, 2014, Cutrale-Safra also wrote a letter to Ms. Anderson, Chairwoman of Chiquita's Board of Directors, and Lonergan, explaining the terms of the

Cutrale-Safra Proposal and stating that it believed its proposal constituted a "bona fide unsolicited written Chiquita Alternative Proposal," under Section 5.4(b) of the Merger Agreement, as well as a "Chiquita Superior Proposal." Accordingly, the Chiquita Board of Directors would be permitted to provide Cutrale-Safra with confidential information and negotiate with Cutrale-Safra under the terms of the original Transaction Agreement.

71.   On August 14, 2014, Chiquita issued another press release stating that its Board had

> determined that the unsolicited offer from the Cutrale Group and the Safra Group announced on August 11, 2014 . . . is inadequate and not in the best interests of Chiquita shareholders. Having made such a determination, Chiquita has determined not to furnish information to, and have discussions with, the Cutrale Group and the Safra Group at this time. The Chiquita Board of Directors has also unanimously reaffirmed its recommendation that Chiquita shareholders vote to approve the definitive merger agreement between Chiquita and Fyffes.

72.   On August 15, 2014, Cutrale-Safra filed a preliminary proxy statement with the SEC soliciting votes "AGAINST" the Proposed Transaction and "FOR" a proposal to adjourn the special shareholder meeting set for September 17, 2014.

73.   On August 27, 2014, Chiquita issued another press release to announce

> updated anticipated annualized pre-tax cost synergies for the proposed combination of Chiquita and Fyffes. . . . Chiquita and Fyffes have identified an additional $20 million of synergies for a total of at least $60 million in annualized pre-tax cost synergies by the end of 2016, reflecting additional information which has become available regarding optimization of sourcing and shipping logistics, as well as the output of the information technology integration planning work stream that was established after the proposed Combination was first announced. The $20 million of additional recurring annual synergies is anticipated to come from European and Mediterranean shipping benefits enabled by the broad geographic sourcing diversity of the combined company, as well as information technology efficiencies due to the implementation of cloud computing.

74.   On August 27, 2014, Cutrale-Safra announced that the "Chiquita Board simply rejected the Cutrale-Safra Proposal without making any effort to reach out to the representatives

of the Cutrale Group or the Safra Group to explore the Cutrale-Safra Proposal."  Cutrale-Safra further stated that it was inconsistent with the Chiquita Board's fiduciary duties not to furnish information to Cutrale-Safra or engage in negotiations given that the "Cutrale-Safra Proposal provides greater and more certain value to Chiquita's shareholders' than the Proposed Transaction."

75.     On September 8, 2014, the Company announced that it had postponed the Special Meeting of Shareholders that had been scheduled for September 17, 2014 until October 3, 2014. The Company also announced that Fyffes had granted Chiquita a

> waiver that permits Chiquita to engage in discussions with the Cutrale Group and the Safra Group.  Accordingly, Chiquita has sent a letter to Cutrale/Safra indicating its willingness to offer Cutrale/Safra the opportunity to conduct focused due diligence and present its final and best offer. . . . In the interim, Chiquita continues to recommend that its shareholders vote "FOR" the Fyffes transaction . . . .

76.     On September 10, 2014, Cutrale-Safra confirmed that it had entered into a confidentiality agreement with Chiquita, and that it would use its "best efforts to complete its due diligence and present its definitive offer as expeditiously as possible for Chiquita's consideration."   Chiquita issued a press release on the same date stating that it had "agreed to allow Cutrale/Safra to conduct due diligence, including access to a data room and its management team."

77.     Cutrale-Safra has stated that it has all the necessary financing in place to fund its $13 per share cash offer.  The Cutrale-Safra Proposal is not conditioned on Cutrale-Safra's ability to obtain any financing.  The Curtrale Group and/or the Safra Group will provide all the necessary capital themselves, and will also fund any repurchase or redemption obligations.

78.     Cutrale-Safra asked Chiquita shareholders to vote against the Proposed Transaction.  In so doing, Cutrale-Safra stressed the great risks to Chiquita shareholders that a

combined entity would present.   In particular, Cutrale-Safra stated that Fyffes is actually a middleman in the industry, and would cause dilution of Chiquita's production capability. Furthermore, the European fruit and vegetable market is highly volatile.   Finally, the Proposed Transaction faced regulatory, integration, and synergy realization risks.

79.   Cutrale-Safra also pointed out that while the Proposed Transaction is structured as a "tax inversion transaction," which would benefit Chiquita because ChiquitaFyffes would be an Irish entity and classified as a non-U.S. resident for federal income tax purposes, recent legislative proposals may expand the scope of U.S. corporate tax residence.   Furthermore, the U.S. Treasury Department is reviewing ways to limit the ability of companies to engage in inversions, including reducing tax benefits after the inversions have occurred.

80.   Cutrale-Safra also highlighted past problems Chiquita has had with regard to integration post-acquisition, focusing in particular on an acquisition of the Fresh Express unit of the Performance Food Group in 2005.   Chiquita paid $855 million for the business, but recently announced $555 million in impairment charges relating to the acquisition.

81.   Another risk described by Cutrale-Safra is the risk that the $40 million in synergies – much less the suddenly available additional $20 million – would ever be realized, particularly given the both companies' track records of missed earnings.

82.   In response to the Cutrale-Safra offer, on September 26, 2014, Chiquita announced it had renegotiated the terms of the original transaction with Fyffes.   The revised deal would provide Chiquita shareholders with 59.6% of the combined new entity, and Fyffes with 40.4%.   Under the revised Proposed Transaction, each holder of Fyffes common stock would receive the right to receive from ChiquitaFyffes 0.1113 of a ChiquitaFyffes ordinary share.

According to Cutrale-Safra, this values the combined entity at $11.82 per share, which is still below the Cutrale-Safra proposal of $13 per share.

83.     In addition, the Company announced that it had negotiated a Supplemental Reimbursement Expenses Agreement with Fyffes, pursuant to which the Termination Fee that Chiquita would have to pay to Fyffes was increased from 1% to 3.5% of Chiquita's total issued capital.

84.     Finally, on September 26, 2014, Chiquita announced that the date for the shareholder vote was delayed first until October 3, 2014, and then again until October 24, 2014.

85.     Fyffes and Chiquita have justified the new ownership ratios by claiming to have found and additional $20 million in synergies.  However, the reliability of these new found synergies are dubious.

**D.     Preclusive Deal Provisions in the Transaction Agreement**

86.     The current Transaction Agreement includes several provisions that inhibit the Chiquita Board's ability to negotiate a fair price for the Chiquita shareholders.  Section 5.4(a) of the Transaction Agreement is entitled, "Non-Solicitation Applicable to Chiquita," and prohibits Chiquita or its representatives to "directly or indirectly: (i) solicit, initiate or knowingly encourage any enquiry with respect to, or the making or submission of, any Chiquita Alternative Proposal or (ii) participate in any discussions or negotiations regarding a Chiquita Alternative Proposal with, or furnish any nonpublic information of Chiquita to, any person that has made or, to Chiquita's knowledge, is considering making a Chiquita Alternative Proposal, except to notify such person as to the existence of the provisions of this Clause 5.4."

87.     Section 5.4(b) of the Transaction Agreement includes a "fiduciary out," which permits Chiquita to negotiate with and provide confidential information to a third party upon

receipt of a "bona fide unsolicited written Chiquita Alternative Proposal," that the failure to take such actions would "reasonably likely to be inconsistent with the directors' fiduciary duties." However, upon receipt of such offer, Chiquita is required to notify Fyffes orally and in writing within 48 hours, and to keep Fyffes apprised of the negotiation developments.

88.     Section 5.4(c) of the Transaction Agreement further prohibits the Chiquita Board from withdrawing its recommendation of the Proposed Transaction except under limited circumstances.

89.     Section 5.4(i) states that Chiquita may terminate the Transaction Agreement if it has concluded in good faith that a Chiquita Alternative Proposal constitutes a Chiquita Superior Proposal, and that failure to take such action "would be reasonably likely to be inconsistent with the directors' fiduciary duties."

90.     Pursuant to the Expenses Reimbursement Agreement, Chiquita agreed to pay Fyffes "up to one percent (1%) of the total value of the issued share capital of Chiquita calculated based on the closing price of the Chiquita shares on the business day immediately preceding the event giving rise to the reimbursement obligation," if any of the following occur: (i) the Chiquita Board withdraws its recommendations to approve the Proposed Transaction; (ii) the Chiquita Board recommends a Chiquita Alternative Transaction; or (iii) Chiquita enters into an agreement providing for a Chiquita Superior Proposal.

91.     Pursuant to the Expenses Reimbursement Agreement, as well as Rule 21.2 of the Irish Takeover Rules, Fyffes is required to pay Chiquita the same amount – "up to one percent (1%) of the total value of the issued share capital of Fyffes calculated based on the closing price of the Fyffes shares on the business day immediately preceding the event giving rise to the reimbursement obligation."

92.     On September 25, 2014, and in response to the Cutrale-Safra Proposal, Chiquita and Fyffes entered into a Supplemental Expenses Reimbursement Agreement which increased the amount Chiquita would have to pay Fyffes upon any of the conditions set forth above to 3.5% of the total value of issued share capital of Chiquita.  The amount Fyffes was required to pay remained at 1%.   The plain purpose of the Supplemental Expenses Reimbursement Agreement was to thwart the attempt of Cutrale-Safra, or any other bidder for that matter, from consummating its Tender Offer.

**E.     Diminished Rights Under the Laws of Ireland**

93.     In addition to the value left on the table for Chiquita shareholders in the Proposed Transaction, as well as the preclusive deal protections in the Transaction Agreement, the Proposed Transaction is unfair because it requires Chiquita shareholders to give up important rights that fundamentally alter the nature of their investments.  Instead of being incorporated under the laws of New Jersey, ChiquitaFyffes will be a public limited company organized under the laws of Ireland.  This change in the governing law will result in (at least) six material changes that diminish the rights of Chiquita's shareholders.

94.     First, under Irish law, shareholders do not have dissenters' or appraisal rights.  If ChiquitaFyffes were ever to merge with a company incorporated in the European Economic Area and the other company is the surviving entity, a shareholder who voted against the merger has the right to request that the company acquire his or her shares for cash at a price determined in accordance with the share exchange ratio set out in the merger transaction.  Under New Jersey law, in comparison, Chiquita shareholders have the right to dissent and to obtain payment for the fair value of his or her shares, even if that amount is more than what is set out in the proposed transaction.

95.     Second, under Irish law, there is no clear right to a control premium for surrendering shares in a change of control transaction.  Thus, while in most stock-for-stock merger transactions it might not appear that shareholders are giving up this important right to a control premium, here Chiquita shareholders are giving up such a right because of the fundamental change in their ownership going from a New Jersey corporation to an Irish corporation, where the right to a control premium is not protected and litigation rights are constrained.

96.     Third, under Irish law, derivative actions by shareholders are only allowed in limited situations.  In general, derivative actions are only allowed where a wrong committed against the company would otherwise go un-redressed, unless the action is brought.  To bring such a case under Irish law, a shareholder must first establish a *prima facie* case (1) that the company is entitled to the relief claimed and (2) that one of the following occurred: (a) an *ultra vires* or illegal act is perpetrated; (b) more than a bare majority is required to ratify the "wrong" complained of; (c) the shareholders' personal rights are infringed; (d) a fraud has been perpetrated upon a minority by those in control; or (e) the justice of the case requires a minority to be permitted to institute proceedings.  Under Irish law, a shareholder may also bring suit against the company where the affairs of the company or the powers of the directors are being exercised in a manner oppressive to the shareholders or in disregard to their interests.  Under New Jersey law, on the other hand, a shareholder may bring derivative litigation against the corporation if the corporation does not enforce its own rights, subject to the limitation of making a demand on the board of directors before bringing a derivative suit, unless demand is excused.

97.     Fourth, judgments by United States Courts are not automatically enforceable in Ireland against ChiquitaFyffes.  There is no treaty between the United States and Ireland

providing for reciprocal enforcement of foreign judgments.  To have a judgment from the United States even be considered to be enforceable in Ireland, the judgment must be for a definite sum, the judgment must be final and conclusive, and the judgment must be by a court of competent jurisdiction.  Additionally, an Irish court may exercise its right to refuse judgment if the judgment was obtained by fraud, violated Irish public policy, is in breach of natural justice, or if it is irreconcilable with an earlier foreign judgment.

98.     Fifth, under Irish law, shareholders must notify the company if they will be holding more than 3% of the shares or if they hold more than 5% of the shares of any alteration in their holdings within five business days of the alteration in their holdings.  If the shareholder does not make this notification, they will have no right or interest in respect to the shares concerned and the company may seek a court order directing that the affected shares be subject to certain restrictions, such as no voting rights, transfers being void, or no payments due from the company on those shares.  Under New Jersey law there is no similar requirement.

99.     Sixth, under Irish law, shareholders do not have a right to bring business before a shareholders' meeting – with the exception of being allowed to nominate a director with at least 60 days' notice to the secretary, as well as a few other requirements.  Under New Jersey law, however, shareholders can bring any business before an annual meeting with 60 days' notice, as well as if a few other requirements are met.

## CLASS ACTION ALLEGATIONS

100.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23, individually and on behalf of all other holders of Chiquita's common stock (except defendants herein and any persons, firm, trust, corporation, or other entity related to or affiliated with them and their

successors in interest) who are or will be threatened with injury arising from defendants' wrongful actions, as more fully described herein.

101.    This action is properly maintainable as a class action.

102.    The Class is so numerous that joinder of all members is impracticable.   The Company has thousands of shareholders who are scattered throughout the United States.   As of October 1, 2014, there were 47,807,168 shares of Chiquita's common stock outstanding.

103.    There are questions of law and fact common to the Class including, *inter alia*, whether:

a.  The Individual Defendants breached their fiduciary duties by failing to negotiate in good faith and in the best interests of the Chiquita shareholders;

b.  The Individual Defendants breached their fiduciary duties by agreeing to a combination between Fyffes and Chiquita that heavily favored Fyffes shareholders over Chiquita shareholders  in the newly combined entity;

c.  The Individual Defendants breached their fiduciary duties by agreeing to a combination between Fyffes and Chiquita that failed to adequately compensate Chiquita shareholders for their shares of common stock;

d.  The Individual Defendants breached their fiduciary duties by agreeing to a deal which converts the Chiquita shareholders' interest in a New Jersey entity to an entity organized under the laws of Ireland, thereby forcing them to relinquish important shareholder rights;

e.  The Individual Defendants breached their fiduciary duties by increasing the Termination Fee that would be owed to Fyffes from 1% to 3.5% of Chiquita's equity value in order to deter or prevent Cutrale-Safra from consummating its tender offer;

f.   The Individual Defendants are acting in furtherance of their own self-interest to the detriment of the Class;

g.   Plaintiff and the other members of the Class are being and will continue to be injured by the wrongful conduct alleged herein and, if so, what is the proper remedy and/or measure of damages; and

h.   Plaintiff and the other members of the Class will be damaged irreparably by Defendants' conduct.

104.   Plaintiff is committed to prosecuting the action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class.  Plaintiff is an adequate representative of the Class.

105.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class, which would, as a practical matter, be disjunctive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

106.   Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class, as a whole, is appropriate.

### COUNT I
**(Breach of Fiduciary Duty Against All Individual Defendants)**

107.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if set forth in full herein.

108.     The Individual Defendants, as Chiquita directors, owe the Class the utmost fiduciary duties of due care, good faith, candor and loyalty.  By virtue of their positions as directors and/or officers of Chiquita and/or their exercise of control and ownership over the business and corporate affairs of the Company, the Individual Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein.  Each Individual Defendant was required to: (a) use their ability to control and manage Chiquita in a fair, just and equitable manner; (b) act in furtherance of the best interests of Chiquita and its shareholders and not their own; and (c) fully disclose the material circumstances, procedures, and terms of the Proposed Transaction so that shareholders can make a fully informed decision.

109.     The Individual Defendants failed to fulfill their fiduciary duties by negotiating a merger that favored Fyffes shareholders over Chiquita shareholders, by failing initially to negotiate with Cutrale-Safra, which offered a Superior Proposal, and by agreeing to increase the Termination Fee by 3.5x, making it all but certain that the Proposed Transaction would be consummated.

110.     As a result of the Chiquita directors' breaches of fiduciary duty in agreeing to the Proposed Transaction, the Class will be harmed by receiving the inferior consideration offered in the Proposed Transaction.

111.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II
### (Declaratory Judgment
### Declaring That Merger Agreement Is Unenforceable)

112.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if set forth in full herein.

113.   The Merger Agreement unlawfully restricts the Chiquita Board from exercising its fiduciary duties.

114.   The Merger Agreement fails to adequately protect the interests of Chiquita shareholders in the event the Proposed Transaction is not consummated.

115.   Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

116.   As a result of the Defendants' breaches of fiduciary duties, Plaintiffs and the other members of the Class have and will be damaged in that they are prevented from obtaining a fair price for their shares and are at undue risk of injury.

## COUNT III
### Injunctive Relief Against Defendant Chiquita

117.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if set forth in full herein.

118.   Defendant Chiquita has scheduled the shareholder vote on the merger for October 24, 2014.  On that date, therefore, Plaintiff and other shareholders may be forced to accept unfair consideration for their shares and may lose their rights as shareholders of a New Jersey corporation, including their rights to a future appraisal and/or a control premium.  Plaintiff and other shareholders will thus suffer irreparable harm if the October 24, 2014 vote is allowed to go forward.

119.   Plaintiff and the Class therefore seek an injunction to prevent the shareholder vote from going forward unless and until the breaches of fiduciary duties set forth herein are properly remedied.

31

120.    Plaintiff and the Class have no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment as follows:

a.    Preliminarily and permanently enjoining Chiquita, Chiquita Board members and any and all other employees, agents, or representatives of the Company and persons acting in concert with any one or more of any of the foregoing, during the pendency of this action, from taking any action to consummate the Proposed Transaction until such time as the Chiquita Board has fully complied with their fiduciary duties to fully appreciate all of the Company's strategic alternatives;

b.    Finding the Chiquita Board liable for breaching their fiduciary duties to the Class;

c.    Finding the Termination Fee invalid and unenforceable, or in the alternative, amending the Termination Fee as necessary to ensure a full and fair sale process for the benefit of the Class;

d.    Requiring the Chiquita Board to fully inform itself of all of the Company's strategic alternatives, and giving full and fair consideration to any alternative offers for the Company, including without limitation, any proposals offered by Cutrale-Safra;

e.    Requiring the Chiquita Board and Fyffes to disclose all material information relating to the Proposed Transaction and the related shareholder approval process;

f.    Awarding the Class compensatory damages, together with pre- and post-judgment interest;

g.    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

h.    Awarding such other and further relief as is just and equitable.

Dated:  October 7, 2014

CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO
Attorneys for Plaintiff

By:  /s/ James Cecchi
James Cecchi
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700

Jonathan M. Stein
Adam Warden
SAXENA WHITE P.A.
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
(561) 394-3399

*Co-counsel for Plaintiff*

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

Dated:  October 7, 2014

CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO
Attorneys for Plaintiff

By:  /s/ James Cecchi
James Cecchi
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700

Jonathan M. Stein
Adam Warden
SAXENA WHITE P.A.
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
 (561) 394-3399